Good morning, and may it please the Court, Margaret Dayton, on behalf of Defendant and Appellant Wayne Weaver. With the Court's permission, I would like to reserve three minutes of my time for rebuttal. All right. Keep an eye on the clock. Yes, Your Honor. In my remaining time, I would like to address two issues, the grant of summary judgment on the fraud claim and the award of disgorgement after Kokesh. I will begin with the fraud claim. As the Court is aware from the papers, three different theories of fraud have been advanced against Mr. Weaver throughout the course of this litigation. The first is the SEC's theory in its summary judgment papers before the District Court. The second is the theory articulated in the District Court's order. And the third is the SEC's new arguments raised for the first time on appeal. Rather than describing them in the abstract, could you tell us how they differ in factual? Yes, Your Honor. The, in the District Court, the Securities and Exchange Commission argued that the straight path financing agreement was a sham transaction and for that created liability under Rules 10b-5a and c. So, to prevail on that theory, the SEC had to prove that the straight path financing agreement was completely devoid of economic substance and an entirely illegitimate transaction. And that's under Simpson v. AOL. Not only that, but that the, there's no tribal issue of fact, but that Weaver knew that. Yes. And was instrumental in the, in the agreement. Yes, Your Honor. So, that's theory one. And that's, those are the facts in the law that govern under theory one. Theory two is the District Court's order, which the District Court ruled that the straight path financing agreement became deceptive when coupled with Jam and Java's releases and disclosures regarding the straight path financing agreement. So this puts us in, it's not clear if the District Court was ruling that the transaction was only deceptive due to its coupling with the disclosures of Jam and Java, which under Simpson v. AOL, again, is not a valid basis for liability. When a transaction is only deceptive when paired with the statements of another, that's insufficient under Simpson v. AOL. And what Simpson v. AOL, in particular on the facts of that case, it was dismissed, it was a dismissal because the transactions were not Jams as a matter of law, because they only became deceptive when paired with Home Store's financial disclosures regarding those transactions. To the extent the District Court was promising Mr. Weaver's liability solely on omissions, Mr. Weaver cannot be liable for those because he is neither the maker nor the disseminator of those statements. So, and the parties, since the parties briefed the issue of liability for the misstatement of another, it's been significantly clarified. SEC v. Lorenzo, which the Securities and Exchange Commission submitted as supplemental authority and Mr. Weaver also commented on, holds that to be liable for the misstatement of another under Rules 10b-5a and c, scheme liability, a defendant has to either make or disseminate the false statement. Mr. Weaver did neither here. The record is undisputed on that. So that brings us to the third. So those are the facts and the principles on the District Court's theory. That brings us to the third theory that's been advanced against Mr. Weaver here, which is the SEC's new arguments on appeal. The Court did ask me to address how these differ in fact and in legal principles. We do argue in the briefs and I would put before the Court very briefly just that this has been waived. Under Rake v. Gonzalez, arguments not raised below are waived on appeal. There are some exceptions to that rule. However, they clearly do not apply in this instance. These are quintessentially fact-based arguments that were not even offered below, much less proven with disputed facts. Kennedy, I'll tell you what bothers me about this case. What bothers me about this case is the statement by the District Court judge based on the Colello case, that the inferences from the evidence should be taken in the light most favorable to the moving party, SEC. This comes as a bit of a surprise to me because for the last 18 years I've been thinking just the opposite, that the inferences of the evidence submitted by a moving party are taken in light most favorable to the non-moving party. Do you have a view on that? Yes, Your Honor. As you know from our briefs, that troubled Mr. Weaver as well. You say it troubled Mr. Weaver, but you never argue that Colello is distinguishable from this case. Well, the District Court, if you look at the Colello opinion, the District Court's articulation of the rule is a misstatement of... Just a minute. Well, just a minute. If I look at Colello and now I'm trying to determine whether to apply Colello or not, then at that point it seems to me that at least in your briefing you ought to tell me why it's distinguishable from this case, and I couldn't find it. So I guess I'm allowing you to do it now. Why is Colello anything distinguishable from this case? I'm not certain I understand your question, Your Honor, with respect to... I'll tell you what. I'll just let you understand the question. Colello says that what we have here is we have an enforcement action, and in Colello, again, the person who the SEC brought the action against decided that they would take the Fifth Amendment, and the district judge was free in that particular case to draw adverse inferences against that person. They couldn't suggest that they were guilty or that somehow they had some problem with what they were saying or doing, but they applied the same, if you will, standard of review that the court applied in this case. So why should we not allow that here? Well, we agree and we don't dispute in the papers that the adverse inference can be applied in this case. What we dispute is the way that the adverse inference was applied. And it was applied exactly the same in Colello. I disagree, Your Honor. How was it different? The Colello court did not turn the summary judgment standard on its head. Although the facts in light most favorable to the non-moving party. Let me read the language in Colello. District courts have discretion to and have imposed fairly severe penalties in such cases. The only inference the court may not draw is an inference of guilty. However, other than that, nothing. All we need to have is some evidence in addition to an adverse inference to support the court's ruling. That's all a district court did here. There was no evidence. The question turned on whether there was additional evidence. And that's what we have here. Respectfully, Your Honor, I disagree. What evidence is there which would suggest that? Well, what, why do you suggest there is no additional evidence besides, if you will, the district court's applying its discretion in making an adverse inference from the invocation? I mean, it seems to me in this particular case, we had the Berger, or excuse me, the Barrett declaration, the Weaver-Berlinger email chain. Both of those are additional evidence, which would give the district court every reason to come out in its inference the way it did. Respectfully, Your Honor, on summary judgment, they need to show the facts are undisputed. Well, but just a minute. There were no facts on your particular side that would undo the facts in the Barrett declaration and the Weaver-Berlinger email chain. And especially if one would give the district court's inference, we would come out the same. But I guess I couldn't find where the evidence, even if I didn't give the district court its inference as to taking the light most favorable to the SEC, why we wouldn't come out the same way. Well, Your Honor, the facts that were in dispute on summary judgment, the theory that was articulated was only regarding the Straight Path financing agreement and whether or not it was a sham transaction. Mr. Weaver disputed And whether Mr. Weaver was intimately involved in that sham transaction. Precisely, Your Honor. And there are factual disputes as to both of those issues. And that was the only issue before the district court and the only issue on which the SEC proffered any facts it even contended were undisputed. To point very quickly, I'm running short on time. The Barrett declaration that the SEC cites at length on appeal, first, it cites to paragraphs that were never even cited in its separate statement of facts, specifically paragraphs 27 to 33. Those facts were not even proffered as undisputed, much less undisputed. Mr. Weaver also made an evidentiary objection to that. That evidentiary objection was not appealed because the claims for which the Barrett declaration were offered were only relating to claims, that evidence only related to claims that Mr. Weaver did not appeal, the Section 5 and the Section 13d violation. To consider this type of factual evidence for the first time on appeal as to these new claims is inappropriate. Some of the facts weren't even proffered as undisputed, and those that were proffered as undisputed were only proffered in support of claims that are not on appeal and were the subject to an evidentiary objection that's not on appeal. I apologize. If you might. Take the time you need. You're here to answer the questions. I have a question also. We're not going to stop you up. We're going to give you the time. Okay. Thank you. It seems to me that your client, even if your client did not negotiate the straight path agreement or make the announcement, your client did create the straight path agreement some months after the agreement, right? Yes, Your Honor. That fact was undisputed. And your client did also make several payments under the agreement, right? Yes, Your Honor. That fact was undisputed. And if that is not primary liability, why not? Your Honor, because what the SEC's argument with respect to the straight path financing agreement was that it was a sham transaction that creates scheme liability. Under Simpson v. AOL, a transaction has to be completely devoid of economic substance and entirely illegitimate. There are factual disputes as to the legitimacy of the straight path agreement, in particular because the funding that was contemplated for under the agreement was paid, and those funds were then used for operating purposes as contemplated by the agreement. In Simpson v. AOL, the facts of that case demonstrate that when a transaction has economic substance because it is, it occurs in the way that it's contemplated to occur, it cannot be a scheme liability sham transaction as a matter of law. In Simpson v. AOL, there were third-party triangular transactions, essentially round-tripping transactions, that were to provide advertising in exchange for money. And in that case, the plaintiffs alleged that the AOL defendants intentionally structured those transactions in order to inflate home stores' revenues, and the AOL defendants did so knowingly and intentionally, and helped to structure the transactions, and additionally facilitated in hiding the transactions through nature of the round-tripping transactions from the auditors. Under that case, because the transactions themselves, advertising and money, were exchanged, they were not shams as a matter of law. So even though, even though transactions have suspect qualities, that's a quote from the Simpson v. AOL case, that doesn't mean they're shams as a matter of law. And you would rather have the judge view the evidence conflicting in a light most favorable to Weaver rather than to the SEC? But regardless, this is summary judgment. And if they, if there's conflicting evidence at all, even with the adverse inference, they, the judge cannot resolve the factual disputes. So what adverse inference should you get in this particular situation, given that Coelho will allow such adverse inference? The district court, as I understood it, just suggested that what it was going to do is take the evidence in the light most favorable to the SEC, rather than taking the evidence in the light most favorable to your client. Your client presented some evidence, but really, as I reviewed it, not much evidence on the very fact situations which we're worried about here. Even if we had the evidence without an inference, my worry was there was no evidence against it. So tell me, what inference should you allow the district court to give in these instances? If you're not going to allow the district court to do what it did, what inference should it be allowed under Coelho? My understanding of the adverse inference is that the, I, I see that I am out of time. Go ahead. I mean, he, he, he will stop you if you need to be stopped. Otherwise, answer my question. Because I think that's something you've got to tell me. If this is not permissible under an abuse of discretion analysis, which a good friend of mine has very easily said what abuse of discretion would mean, I'm trying to figure out why, in that instance, this would be an abuse. And so I'm asking you, what inference that you ought to give? So, as the SEC articulates in its papers, the adverse, and, and we agree, the adverse inference can be drawn that as two specific factual, factual pieces that Mr. Weaver took the fifth on, that the evidence withheld would be negative, would be, would be bad for Mr. Weaver. That's the articulation of the adverse inference, and it's the articulation of the defendant's simple summary judgment standard on its head. And I cite several cases in which the defendant took the fifth on summary judgment, and the normal summary judgment standard applies. Ginsburg-Morgan But those cases were district court cases, were they not? They were not? We have, we are charged with it. Colello. And your client had the opportunity to rebut the government's evidence but didn't, took the fifth. And isn't this where although inartfully declared by the district court judge, the adverse inferences under Colello were permitted on questions of fact. And isn't that what he did in this case? I disagree, Your Honor. The district court below didn't articulate when and where the adverse inference should be applied. In its papers, the SEC stated that it gets one, but didn't argue as to any particular fact that the adverse inference should be applied. And here, although Mr. Weaver took the fifth, that doesn't prevent him from disputing the evidence in the record with other evidence in the record. The adverse inference doesn't prevent Mr. Weaver or his counsel from pointing to the other facts from other witnesses, from depositions, from documents that show that factual disputes exist here. And Mr. Weaver did that. He demonstrated there are factual issues as to the legitimacy of the straight path agreement. And I, I don't believe that Colello supports a finding that the district court can ignore factual disputes regardless of any inference. Breyer. All right. We've taken you past your time, but we'll give you a couple minutes for rebuttal. Let's hear from the government. Good morning. May it please the court. Daniel Staroselsky for the Securities and Exchange Commission. I'd like to start with the adverse inference discussion Why don't you start with answering a question that's bothering me. As I understood it, Mr. Weaver, taking the fifth, really didn't oppose, didn't introduce any evidence to raise any triable issue of fact, right? Yes, Your Honor. All right. Step one. Step two, the SEC put in evidence showing that Weaver had put together this straight path financing as a phony transaction, right? Yes. What do you do with the evidence of the JAMA and JAVA's CEO who testified that the company had a legitimate purpose in entering the straight path financing and that he had never met or talked to Weaver? Doesn't that raise an issue of fact, triable issue of fact, as to Weaver's involvement as a primary, as to primary liability? No, Your Honor. Those undisputed facts actually established that Mr. Weaver's deception was successful. If you take the evidence in the light most favorable to the government. No, Your Honor. There is no evidence on the other side. Mr. Tron testifies, as Your Honor referred, that he thinks the purpose of the agreement is legitimate. But the only reason he does that is because Mr. Weaver deceived him into thinking so. Well, wait a minute. Didn't he say he had never met or talked to Mr. Weaver? That's right, Your Honor. But, I mean, that just makes Mr. Weaver's deception more effective. Oh, I see. So not talking to a person makes the misrepresentation more effective? If you're able to pull off a deceptive scheme without even meeting someone, that just shows, you know, you're the person behind the scenes pulling all the levers. It would be very bizarre to allow you to escape liability simply because there's other actors involved in the scheme. But I do want to point to two undisputed facts that establish liability here as a matter of law. And I want to say from the very outset that we agree with the district court that there may be a lot of deception here, but you don't need to look any further than the facts that the district court identified as establishing that Mr. Weaver engaged in fraud because he disguised the nature and the source of the financing provided under the so-called Straight Path Agreement. He did this in two ways. Number one, as the court said, he personally sent money to Jam & Java under the guise that it's coming from Straight Path, an independent institutional investor. And number two, Straight Path doesn't even exist at the time, and Mr. Weaver knows it. So he instructs an associate to create it after the fact to make it appear that it was in existence. Both of these facts are undisputed, and they're clearly deceptive because so far as the investing public is aware, Jam & Java, which is this fledgling company, it has $1,037 in revenue as of fiscal year 2011. For all the investing public knows, it has received independent financing from an institutional investor. That suggests that there's some independent party who believes in the company, who is buying into it. And yet the undisputed facts show that there is no such company. What you have is Mr. Weaver creating this quote-unquote Straight Path, but when he creates it, it's not as if he would sell with no bank account, no funds to provide to anyone. Well, whether he created it or not, isn't there an issue of fact based on the Jam & Java CEO's testimony that he didn't know or meet or talk to Mr. Weaver? The only dispute there would, that's not relevant to liability because Mr. Weaver is held liable for the deception that he engages in personally. I don't think, you know, the Jam & Java CEO, yes, he testifies that he doesn't know or he hasn't met Mr. Weaver, but we don't have to show that Mr. Weaver is responsible for every aspect of the fraud. It's sufficient to show that in connection with the purchase or sale of securities acting with Center, Mr. Weaver engaged in deceptive conduct. Your point is that if Weaver sends the money from a Weaver account and says it comes from Straight Path, step one, and Straight Path at that time doesn't exist and Weaver knows it, and then Weaver institutes Straight Path, then Jam & Java has no reason to know who Weaver is or meet him. All they care about is the money coming in. He doesn't, he's able to deceive both Jam & Java CEO, but more fundamentally public investors because, just take a step back here, what Mr. Weaver is doing while he's providing this quote-unquote financing is he's secretly acquiring massive blocks of Jam & Java shares from a company insider and then is dumping those shares on unsuspecting investors and he makes tens of millions of dollars in profit as a result of this conduct. And, you know, he's never disputed that he acted with Center with the intent to deceive. In fact, this does deceive. So no reasonable fact finder could rule for him on these undisputed facts. Let me ask you another question. The idea, the notion that one should take the facts in the light most favorable to the moving party on a motion of summary judgment, that's somewhat unusual, is it not? Your Honor, I stumbled over that aspect of the district court order when I read it as well. And, I mean, to be clear, that is not how we understand the inference. That's not the articulation that we argued for. In fact, your argument is that the court exceeded the bounds of discretion, but it's harmless error, right? I don't even know that it rises to the level of harmless error, Your Honor. I think that is one way of thinking about it. But ultimately, this case is before this court on de novo review. And what you're reviewing is the judgment. And you have to make an independent determination whether the undisputed facts support the judgment or not. They do. You can take the adverse inference entirely out of the equation, and you still get to the same result. But isn't that harmless error? Isn't that what you're arguing? Sure, Your Honor. That's one way of thinking about it. Let me change the subject just a minute. What are the elements for an SEC action under 10b-5 under the charges you brought? Do we need to have reliance here? No, Your Honor. Why? Reliance, as this court has instructed, it's not... I mean, under Deutsch, under Deci versus Deutsche Bank Securities, this is an action by a private party. We would have reliance. But you're the SEC, so I have a case. Reina Research would suggest no reliance in that particular kind of an action. But that was only a 10b-5b action, and we're not under 5b. So what case do I go to to suggest you don't read reliance here? Your Honor, the Supreme Court in Lorenzo just made crystal clear that was an A and C case. There was no B liability. And the Supreme Court said the Commission does not need to show reliance in its enforcement actions. And the reason, I mean, I think this really cuts to the very heart of this case. Reliance is the common thread that holds together the decisions starting from Central Bank to Stone Ridge to Janus and now to Lorenzo. And reliance isn't in the text of Section 10b or Rule 10b-5. It's judicial gloss on those, on the statute and the rule. And what it does, it provides the requisite causal link between the defendant's deception and the victim's harm. But isn't that really the question that Judge Bea has been asking you about? Because he's really going to, if the man who's generally in charge of this doesn't even know about it, how could he rely? So I think reliance is actually a wonderful way of thinking about this case. Because the reason that reliance isn't required or is required in private actions is to provide this causal link. But nobody thinks it's okay to engage in deceptive conduct behind the scenes so it's undisclosed to anyone. The government can still act in those circumstances because it's still wrong to engage in deception regardless of whether someone else ultimately relies on it or not. And the Supreme Court just emphasized this in the Lorenzo case. So in public actions rather than private actions, reliance is not necessary? It's not necessary, Your Honor. It's quite, the courts have been quite explicit. I mean, it's not in the text of Rule 10b-5. It's judicial gloss. And the reason is, as the Supreme Court has said, the private right of action is implied. And the Court has said, well, look, we're going to give a narrow dimension to a right that Congress didn't explicitly provide. But when the government sues in its sovereign capacity as enforcer of the securities laws, the Court reads Section 10b in Rule 10b-5, as the Supreme Court just said in Lorenzo, expansively to fully effectuate the congressional purpose in rooting out all fraud in the securities industry. Isn't that what the Court also said in Rauner Research? Yes, Your Honor. The Rauner Research is directly. Rauner Research really was a B action, not an A and C action, right? I don't recall off the top of my head, Your Honor, but the point is, you know, Reliance, it's not in B, it's not in A or C, it's nowhere in the text. It's really judicial gloss, and you don't impose that judicial gloss on a right of action that Congress explicitly created. And let's move then to the abuse of discretion  Yes, Your Honor. Would you summarize your argument as to why Kokesh does not eliminate this right, this disgorgement in this particular matter? Yes, Your Honor. So, you know, as this Court recognized in the Liu decision, which we submitted as supplemental authority, for purposes of the panel, the law is very clear. You have 40 years of precedent, you have literally dozens of decisions recognizing the disgorgement remedy. But then we got Kokesh. Right, and Kokesh says it's explicitly not addressing the question of disgorgement. Even though it says disgorgement is a penalty within the meaning of 2462, and therefore the statute of limitations applies. It just said we're not addressing this question any further. Do we need to address this question since Kokesh expressly says it's a penalty? Well, and Kokesh explicitly also calls it a form of restitution as well. I understand. And I think the lesson is, as this Court already recognized in the Krull decision that this is pre-Kokesh. But what the Court said is, look, a remedy might have, how a remedy is characterized for purposes of 2462 doesn't dictate necessarily how it's characterized for purposes of the substantive question of whether it's remedial or punitive. And that makes sense because the inquiry is fundamentally different. You know, the principle that's always cited in these 2462 cases, it goes back to Chief Justice Marshall's statement in Adams against Woods, where Chief Justice Marshall said, in a country where not even treason can be prosecuted after three years, it would be utterly repugnant to the genius of our laws to allow a person to be forever liable for a pecuniary forfeiture. That's just not the analysis when you're trying to figure out whether an equity is equitable, meaning that it's within a court's authority to award. But I think, you know, fundamentally, when a lot of cases come before the court where the court is trying to draw a line as to what is properly equitable or not, and really what the court is doing is it's ensuring that courts don't just use the label of equity to perhaps circumvent a legislative scheme that Congress has created and to award relief that Congress didn't authorize. And a lot of cases come before the court where it's hard to make that determination. But this case isn't it because we know that Congress has blessed disgorgement. There are multiple statutes, as we pointed out in our brief, where the Congress has enacted legislation that logically presupposes the existence of the disgorgement remedy. And so you just don't have this conflict of equity evading law. And, you know, there are multiple provisions. I'd like to just point out the, I think, our best example of that, which is in the Sarbanes-Oxley Act of 2002. Up until that point, disgorgement had been authorized, you know, consistent with this court's precedent, as ancillary to an injunction under Section 21d-1 of the Exchange Act. Well, and there's a uniform line of precedent recognizing that. So Sarbanes-Oxley comes along in 2002, and it does two things. One is it codifies courts' authority to order equitable relief in commission actions. And we can presume that Congress knows of the disgorgement remedy. And number two, in the very same act, it directs the commission to study how it collects and distributes disgorgement. It talks about disgorgement being distributed to investors. It amends the bankruptcy laws to provide that disgorgement judgments in SEC actions shall not be discharged in bankruptcy. So you just can't read these statutes together to... Or the only real way to read these statutes is reflecting the congressional understanding that disgorgement is awarded as an equitable remedy. Your time is about done, and I just have one follow-up, and that is I don't think anybody makes the argument that the amount disgorged was unreasonable here, correct? That's correct, Your Honor. Their point is that, you know, the court lacked authority to award any disgorgement at all. And so the amount that Mr. Weaver obtained through his fraudulent actions... Was it $26 million? He's personally liable for $26 million. But nobody's challenging that, as I understand. They're not challenging the amount. They're just saying the court had no authority to do anything about it. They want zero. They want zero. And under this Court's precedent, you know, they could have come in, they could have said there should have been an equitable deduction, such and such funds aren't properly counted as disgorgement. And actually, you know, they did make certain arguments because we originally requested more than $26 million. The court, using its equitable discretion, cut it down to what it thought represented the most just results on the facts of this case. And as the case comes to this Court, that amount is undisputed. Okay, thank you very much. Thank you, Your Honor. We'll give you three minutes for rebuttal. You seem to be in agreement, the two of you, that the statement by the district court granting, um... the movement's testimony, the greatest credibility, is an error. But they say that it's not, it's not a reversible error. What do you say to that? Well, Your Honor, I would agree that the SEC agrees that the rule statement was incorrect. And I would say that we, factual disputes have arisen in the record. And the only way that the district court could disregard those would be to decide factual disputes against Mr. Weber, which is not the role of the court on summary judgment. I would like to now switch gears and address the disgorgement argument in my limited time. All right. I would like you to tell me what those factual errors are. But if you want to go on to the disgorgement, go ahead. Um, I... Okay, well, I don't, I don't want to disregard the court's question, so I, I will. Give me one. Give me your best one. So, under what I was discussing before, under Simpson v. AOL, the SEC had to show that the straight path financing agreement was entirely devoid of economic substance and entirely illegitimate. The funds were exchanged. The money was provided and it was used for JAMA JAVA's operational purposes. Therefore, there's a, there's a question as to the legitimacy of the straight path financing agreement. I would posit that under Simpson v. AOL, it may be that that transaction is not a sham as a matter of law and the SEC would lose as a matter of law, but Mr. Weber did not move for summary judgment here, so that wasn't before the court. All right. You can go to your disgorgement. I, I got your point. Under Miller v. Gamey, this court has to apply not only the holdings of higher court decisions, but also their mode of analysis. If the reasoning or theory of prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel has to apply the reasoning and theory of the intervening Supreme Court decision. Here, Kokesh directly answers the question before this court. Kokesh does because it says, and I quote, nothing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context. The sole question is whether disgorgement as applied here is subject to the statute of limitations. So we explain in our... Exactly what the Supreme Court said, right? That is exactly what footnote 3 says, yes. However, as we set out in our papers, footnote 3 is intended to prevent Kokesh from being an implied endorsement of the disgorgement remedy going forward. The court understood that its opinion eviscerates the foundational principle that allows courts to award disgorgement in equity because disgorgement is a penalty and penalties cannot be awarded in equity. Yet the question certified was what is the statute of limitations for disgorgement? The court had to answer that question. It was the question the parties put before it. In defining a statute of limitations for disgorgement, the SEC... Sorry. The Supreme Court was concerned that people might believe why would you... That that means disgorgement is viable going forward because why would you define a statute of limitations for something that is improper as a whole? And that's what footnote 3 is intended to say. It's intended to say the sole question before us was the statute of limitations but look at the analysis. The SEC's reading and the Liu case's reading of footnote 3 is a command that this court disregard stare decisis, not apply the analysis of Kokesh and ignore pages and pages of a unanimous court's analysis. I would posit to this court that you could lift the analysis of Kokesh into a new word document and you could take that analysis and change the last sentence of the holding. SEC disgorgement bears all the hallmarks of a penalty. Therefore, it cannot be awarded pursuant to this court's inherent equitable powers. The analysis is directly on point. One sentence of the holding needs to change and I don't think that a faithful reading of footnote 3 in that context is what is proffered by the SEC and what was adopted by the Liu court. I see that my time has expired. Thank you very much Ms. Dayton. Thank you. This case will be submitted.
judges: Hawkins, M. Smith Jr., Vratil